Nos. 26-1774, 26-1779

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———————

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEVADA; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WISCONSIN; JOSH SHAPIRO, in the official capacity as Governor of Pennsylvania,

*Plaintiffs-Appellees,*

*v.*

DONALD J. TRUMP, in the official capacity as President of the United States; UNITED STATES DEPARTMENT OF JUSTICE; TODD BLANCHE, in the official capacity as Acting U.S. Attorney General; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in the official capacity as Secretary of the Department of Homeland Security; UNITED STATES SOCIAL SECURITY ADMINISTRATION; FRANK BISIGNANO, in the official capacity as Commissioner of the U.S. Social Security Administration; UNITED STATES POSTAL SERVICE; DAVID STEINER, in the official capacity as Postmaster General and Chief Executive Officer of the Postal Service; DOUG TOLINO, in the official capacity as Deputy Postmaster General, Chief Operating Officer and Chief Human Resources Officer of the Postal Service and Member of the Postal Service Board of Governors; AMBER MCREYNOLDS, in the official capacity as Chair of the Postal Service Board of Governors; DEREK T. KAN, in the official capacity as Vice Chairman of the Postal Service Board of Governors; RONALD STROMAN, in the official capacity as a Member of the Postal Service Board of Governors; DANIEL TANGHERLINI, in the official capacity as a Member of the Postal Service Board of Governors,

*Defendants-Appellants,*

STATE OF ALABAMA; STATE OF MISSOURI; STATE OF FLORIDA; STATE OF INDIANA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TEXAS,

*Interested Parties-Appellants.*

———————

On Appeal from the United States District Court for the District of Massachusetts

———————

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' AND INTERVENORS' EMERGENCY MOTIONS FOR STAY PENDING APPEAL

———————

*(Counsel listed on inside cover)*

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*
M. PATRICK MOORE, JR.
  *First Assistant Attorney General*
DAVID C. KRAVITZ
  *State Solicitor*
VANESSA A. ARSLANIAN
  *State Trial Counsel*
JARED B. COHEN
JAK KUNDL
  *Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2107
Vanessa.Arslanian@mass.gov

*Counsel for the Commonwealth of Massachusetts*

NICHOLAS W. BROWN
  *Attorney General of Washington*
TERA M. HEINTZ
CRISTINA SEPE
KARL D. SMITH
  *Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
Tera.Heintz@atg.wa.gov

*Counsel for the State of Washington*

ROB BONTA
  *Attorney General of California*
SAMUEL T. HARBOURT
  *Solicitor General*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
AARON D. PENNEKAMP
  *Supervising Deputy Solicitor General*
L. NICOLE ALLAN
IAN FEIN
  *Deputy Solicitors General*
SETH E. GOLDSTEIN
  *Supervising Deputy Attorney General*
ANNE P. BELLOWS
KEVIN L. QUADE
LISA C. EHRLICH
MALCOLM A. BRUDIGAM
MICHAEL S. COHEN
ROBERT WILLIAM SETRAKIAN
  *Deputy Attorneys General*
California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
(415) 510-3466
Ian.Fein@doj.ca.gov

*Counsel for the State of California*

AARON D. FORD
  *Attorney General of Nevada*
HEIDI PARRY STERN
  *Solicitor General*
K. BRUNETTI IRELAND
  *Chief of Special Litigation*
1 State of Nevada Way
Las Vegas, NV 89119
(702) 486-9246
hstern@ag.nv.gov

*Counsel for the State of Nevada*

*(Additional counsel listed in signature block)*

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................... 1

Statement of the case .................................................................... 3

Argument ....................................................................................... 8

    I.    Defendants and intervenors are unlikely to succeed
        on appeal .................................................................. 8

        A.    The challenged provisions of the executive order are
            ultra vires and unconstitutional ...................................... 8

        B.    Plaintiffs' claims are justiciable ................................... 14

    II.    The equitable considerations weigh heavily against a stay ..... 23

Conclusion ................................................................................... 28

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Am. Sch. of Magnetic Healing v. McAnnulty*
  187 U.S. 94 (1902)............................................................10

*Arizona v. Inter Tribal Council of Ariz., Inc.*
  570 U.S. 1 (2013)...............................................................4

*Bost v. Ill. State Bd. of Elections*
  607 U.S. 71 (2026).........................................................2, 14

*Building & Constr. Trades Dep't v. Allbaugh*
  295 F.3d 28 (D.C. Cir. 2002)..........................................13

*CASA, Inc. v. Trump*
  793 F. Supp. 3d 687 (D. Md. 2025)................................25

*Chamber of Com. of U.S. v. Reich*
  57 F.3d 1099 (D.C. Cir. 1995)........................................21

*City & Cnty. of San Francisco v. Trump*
  897 F.3d 1225 (9th Cir. 2018) .......................................13

*Clapper v. Amnesty Int'l USA*
  568 U.S. 398 (2013).........................................................20

*Common Cause R.I. v. Gorbea*
  970 F.3d 11 (1st Cir. 2020)............................................24

*Democratic Nat'l Comm. v. Wis. State Legislature*
  141 S. Ct. 28 (2020) .........................................................2

*Doe v. Trump*
  157 F.4th 36 (1st Cir. 2025)............................................16

*DSCC v. Trump*
  2026 WL 1487833 (D.D.C. May 28, 2026).....................20

# TABLE OF AUTHORITIES
## (continued)

**Page**

*E. Bay Sanctuary Covenant v. Trump*
  932 F.3d 742 (9th Cir. 2018) ................................................................26

*First Choice Women's Res. Ctrs., Inc. v. Davenport*
  146 S. Ct. 1114 (2026).......................................................................21

*FirsTier Mortg. Co. v. Invs. Mortg. Ins. Co.*
  498 U.S. 269 (1991)..............................................................................7

*FS Credit Opportunities v. Saba Cap. Master Fund*
  146 S. Ct. 1546 (2026).......................................................................11

*Hannegan v. Esquire, Inc.*
  327 U.S. 146 (1946)............................................................................10

*Jensen v. R.I. Cannabis Control Comm'n*
  160 F.4th 18 (1st Cir. 2025)...............................................................17

*League of Women Voters of U.S. v. Newby*
  838 F.3d 1 (D.C. Cir. 2016).........................................................21, 26

*League of Women Voters v. Trump*
  No. 26-cv-11549 (D. Mass.) .................................................................7

*Merrill v. Milligan*
  142 S. Ct. 879 (2022).....................................................................18, 25

*N.H. Lottery Comm'n v. Rosen*
  986 F.3d 38 (1st Cir. 2021).................................................................22

*NAACP v. USPS*
  2026 WL 1893762 (D.D.C. July 1, 2026) ..........................................25

*New York v. Trump*
  133 F.4th 51 (1st Cir. 2025)................................................................12

*NFIB v. Dep't of Lab.*
  595 U.S. 109 (2022)............................................................................12

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Nken v. Holder*
556 U.S. 418 (2009)..................................................................8

*Norman v. Reed*
502 U.S. 279 (1992)................................................................10

*Obama for Am. v. Husted*
697 F.3d 423 (6th Cir. 2012) ...................................................27

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*
461 U.S. 190 (1983)................................................................20

*Purcell v. Gonzalez*
549 U.S. 1 (2006)..............................................................23, 26

*Rodriguez v. Robbins*
715 F.3d 1127 (9th Cir. 2013) .................................................23

*Shelby Cnty., Ala. v. Holder*
570 U.S. 529 (2013)................................................................15

*Stern v. U.S. Dist. Ct. for Dist. of Mass.*
214 F.3d 4 (1st Cir. 2000).......................................................22

*Susan B. Anthony List v. Driehaus*
573 U.S. 149 (2014)................................................................16

*Trump v. Am. Fed'n of Gov't Emps.*
145 S. Ct. 2635 (2025)............................................................17

*Trump v. Barbara*
609 U.S. __ (2026)..................................................................12

*Trump v. New York*
592 U.S. 125 (2020)..........................................................16, 17

*Trump v. United States*
603 U.S. 593 (2024)..................................................................4

# TABLE OF AUTHORITIES
## (continued)

**Page**

*USPS v. Council of Greenburgh Civic Ass'ns*
 453 U.S. 114 (1981)..................................................................10

*Util. Air Regul. Grp. v. EPA*
 573 U.S. 302 (2014)..................................................................10

*Watson v. Republican Nat'l Comm.*
 609 U.S. __ (2026)......................................................................3

*West Virginia v. EPA*
 597 U.S. 697 (2022)..................................................................10

*Youngstown Sheet & Tube Co. v. Sawyer*
 343 U.S. 579 (1952).......................................................... 13-14

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 4, cl. 1..........................................................3, 8

**STATUTES**

39 U.S.C. § 102(5) .......................................................................11

39 U.S.C. § 401 ...........................................................................10

39 U.S.C. § 404(e) .......................................................................11

39 U.S.C. § 3001 .........................................................................11

52 U.S.C. § 20302..........................................................................4

52 U.S.C. § 20304(b)(2) ..............................................................11

52 U.S.C. § 20501(b)(2) ................................................................4

52 U.S.C. § 20507(c)(1)...............................................................11

52 U.S.C. § 20508(b)(2) ................................................................4

## TABLE OF AUTHORITIES
### (continued)

**Page**

52 U.S.C. § 21083(a)(1)-(2)................................................................4

**COURT RULES**

Federal Rule of Appellate Procedure 4(a)(2).......................................7

**OTHER AUTHORITIES**

90 Fed. Reg. 8449 (Jan. 29, 2025) ....................................................12

91 Fed. Reg. 32915-01 (June 2, 2026)................................................6

Angel & Katz, Brookings, *Trump's New Elections Executive
Order & What It Would Mean for Voters* (May 14, 2026)..........................9

Angel et al., *Mail Voting in the US: Data Points to Very Low Fraud
and Significant Benefits to Voters*, Brookings (Nov. 6, 2025) ...................24

Ctr. for Election Innovation & Research, *Update: Review of
Claims of Noncitizens Registrants and Voters* (Feb. 2026)................... 24-25

Exec. Order No. 14399, *Ensuring Citizenship Verification and
Integrity in Federal Elections*,
91 Fed. Reg. 17125 (Mar. 31, 2026)........................... 5, 6, 11, 14-15, 17, 19

H.R. Rep. No. 107-329, pt. 1 (2001) ...................................................4

M.I.T. Election Data & Sci. Lab, *Voting by Mail and Absentee
Voting* (updated Feb. 28, 2024) .........................................................24

Nat'l Conf. State Legislatures, *How States Verify Voted
Absentee/Mail Ballots* (updated May 20, 2026) .....................................24

Remarks of Pres. Trump (Mar. 9, 2026)................................................5

S. 1383, 119th Cong. (2026).............................................................5

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Sneed et al., *Postal Service Won't Deliver Mail Ballots for States That Don't Hand Over Voter Lists*, CNN (June 10, 2026)............................9

U.S. Gov't Accountability Off., GAO-26-109008, *USPS: Urgent Action Needed to Fix Unsustainable Business Model and Improve Service Performance* (2026)....................................................26, 27

vii

**INTRODUCTION**

With less than four months until this year's midterms, the federal government is rushing to insert itself into state-run elections in unprecedented and unconstitutional ways. To prevent voter confusion, disenfranchisement, and substantial interference with the work of state and local officials who are focused on preparing for the upcoming elections, the district court acted responsibly to preserve the status quo. Its injunction was narrow. The court blocked defendants from implementing the challenged executive order (EO) with respect to the plaintiff States, but only for elections on or before November 3, 2026. For the time being, then, defendants can continue to implement the EO. They are merely barred from adopting changes that would take effect in the coming weeks and months, with just 50 days until mail and absentee voting begins in some States.

Defendants and intervenors have not demonstrated any basis for a stay. Indeed, they do not even attempt to defend the EO's legality on the merits. Nor could they. The Framers entrusted the States and Congress—not the President— with the responsibility to set rules for federal elections. And Congress has not authorized the EO's sweeping directives. Under Section 3 of the EO, the Postal Service would become an elections regulator for the first time in history, with far-reaching power to enforce novel enrollment rules for mail voting, impose ballot-mail design requirements, and even refuse to deliver ballots. Section 2 threatens

1

prosecution of state and local elections officials for failing to determine voter eligibility using federally compiled "State Citizenship Lists."  The President has been clear about his intentions:  "to get rid of MAIL-IN BALLOTS," Dkt. 103-1; help "'Republicans . . . take over'" voting, Dkt. 105 ¶ 2; and ensure that "States are merely an 'agent' for the Federal Government in . . . tabulating the votes," Dkt. 103-1.  Nothing could be further from our constitutional design.

Defendants and intervenors argue that plaintiffs' challenge is premature because the EO has not been fully implemented.  But review at this stage hardly requires guesswork or "speculation."  *E.g.*, U.S. Mot. 20.  The EO imposes "specific directives" on a "specified" timetable, Dkt. 190 at 16, and federal officials have proceeded to implement those directives.  In their stay papers below, defendants even detailed the steps they are taking to roll out a final version of the USPS ballot-interception program in the coming weeks.  Dkt. 194-2 ¶¶ 7-8.

Delaying review would not only "channel . . . [an] election dispute[] to shortly before election day," contrary to the Supreme Court's instructions.  *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 80 (2026).  It would also cause tremendous harm to plaintiffs.  "[R]unning a statewide election is a complicated endeavor" that requires "a massive coordinated effort" of "thousands of state and local officials" who "must communicate to voters how, when, and where they may cast their ballots."  *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31

(2020) (Kavanaugh, J., concurring).  Without an injunction in place, plaintiffs would need to take immediate, costly steps—including ballot-mail redesign, complex data processing and IT upgrades, public education campaigns, and training for elections officials.  Those steps are not "voluntary decisions to divert resources."  U.S. Mot. 16.  They are essential contingency measures by responsible elections officials to prevent defendants' experimentation with USPS ballot interception and other novel programs from sowing chaos ahead of the midterms.

Even with those contingency measures in place, the EO would still pose a serious threat to our democracy.  Mistakes would inevitably be made, for example, as USPS rolls out untested data tools and assembles new lists of voters eligible to vote by mail.  The practical consequence would likely be disenfranchisement of many voters—especially rural and disabled voters, who disproportionately rely on mail voting.  Defendants and intervenors provide no sensible reason to issue a stay and run that risk.  They cannot show irreparable harm from an injunction that merely bars vast changes to our Nation's system of elections administration on a highly irregular, hurried timeline.  The request for a stay should be denied.

## STATEMENT OF THE CASE

The Constitution entrusts power over federal elections to "state legislatures 'primarily' and [to] Congress 'ultimately.'"  *Watson v. Republican Nat'l Comm.*, 609 U.S. __, 2026 WL 1855462, at *3 (2026); *see* U.S. Const. art. I, § 4, cl. 1;

3

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9, 16 (2013).  The Constitution vests no such power in the President.  *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 627-628 (2024).  "Historically, elections in [the U.S.] have been administered at the state and local level."  H.R. Rep. No. 107-329, pt. 1, at 31 (2001).  This "dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome."  *Id.* at 32.

Consistent with this longstanding tradition, plaintiffs—22 States, the District of Columbia, and the Governor of Pennsylvania—administer federal elections pursuant to extensive state laws and several federal enactments.  *See* Dkt. 105 ¶¶ 6-7, 9-14, 40-43.  Under the National Voter Registration Act (NVRA), which is designed to "enhance[] the participation of eligible citizens as voters in [federal] elections," 52 U.S.C. § 20501(b)(2), plaintiffs require individuals registering to vote to verify their eligibility, including their citizenship, *id.* § 20508(b)(2).  Plaintiffs also maintain and update voter registration lists under the Help America Vote Act (HAVA).  *Id.* § 21083(a)(1)-(2).  And under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), plaintiffs ensure that voters in the military and residing overseas can cast ballots by mail.  *Id.* § 20302.

In recent months, President Trump has repeatedly urged Congress to enact the Safeguard American Voter Eligibility Act ("SAVE America Act")—a bill that

4

would require, among other things, documentary proof of citizenship for voter registration; removal of suspected noncitizens from States' voter rolls using citizenship information in databases compiled by the federal government; and in-person voter registration instead of online or mail registration, which are more accessible for many voters. *See* S. 1383, 119th Cong. (2026). The President has told Republican lawmakers that the bill would "guarantee the midterms."[1]

Shortly after the bill stalled in the Senate, President Trump issued the EO challenged in this case, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections." 91 Fed. Reg. 17125 (Mar. 31, 2026). Section 2(a) of the EO directs federal officials to create "State Citizenship Lists" of every adult U.S. citizen residing in each State and transmit those lists to state elections officials "no fewer than 60 days before each regularly scheduled Federal election." Section 2(b) threatens "prosecution of State and local officials . . . who issue Federal ballots to individuals not eligible to vote in a Federal election." Read together, Sections 2(a) and 2(b) threaten prosecution of officials who do not use the lists to verify citizenship. *See* Dkt. 103-2 (White House "fact sheet[]" explaining that the EO "order[s] citizenship verification").

---

[1] Remarks of Pres. Trump, 49:53-57 (Mar. 9, 2026), https://www.pbs.org/newshour/politics/watch-live-trump-addresses-house-republicans-at-annual-policy-retreat-in-florida.

Section 3 directs USPS to create lists of individuals in each State who are "enrolled" with USPS for mail voting. EO § 3(b)(iii)-(iv). USPS must then refuse to transmit mail ballots for any voters not on those lists. *Id.* Section 3 also requires USPS to adopt regulations governing numerous aspects of mail ballot envelopes, such as specific markings and tracking technology to facilitate USPS' ability to intercept ballots when it wishes to prevent their delivery. *See id.* § 3(b)(i). "Any final rule" adopted pursuant to Section 3 "shall be issued no later than 120 days from the date of th[e]" EO. *Id.* § 3(d).

Since the EO's issuance in March, federal officials have proceeded to implement its directives. In early June, USPS published a proposed rule to carry out Section 3. *See* 91 Fed. Reg. 32915-01 (June 2, 2026); Dkt. 189. Anticipating that the rule will be finalized "[b]y the time that the first mail-in ballot is ready to mail," federal officials have explained that they are "taking steps to create a Postal Service portal that state and local election officials . . . will utilize to provide [lists of eligible voters] to the Postal Service." Dkt. 194-2 ¶ 7. Federal officials have also explained that "mailers of outgoing ballots to which a final rule would apply must have access to the system, be registered as a user, and understand how to use it, so that they can provide names of voters they are sending mail-in or absentee ballots to, as well as the barcodes for the outgoing and return mail access." *Id.*

6

Separately, the Department of Homeland Security has approved plans to compile, maintain, and transmit State Citizenship Lists under Section 2. Dkts. 183, 188.

Plaintiffs sued, challenging Sections 2 and 3. Dkt. 1 at 36-42; Dkt. 65 at 36-43. Although the court dismissed plaintiffs' claims in part on prudential ripeness grounds, it allowed plaintiffs to challenge the EO as applied to the rapidly approaching midterms. Dkt. 190 at 10-17. The court then granted summary judgment, declaring Sections 2 and 3 ultra vires and enjoining defendants from implementing those provisions for federal elections on or before November 3, 2026, in the plaintiff States. Dkt. 191 at 34-36. When entering final judgment, the court made clear that the declaratory aspect of its order is likewise limited to this fall's elections. Dkt. 207 at 2. The district court denied motions by defendants and intervenors to stay the injunction pending appeal. Dkt. 208.[2]

---

[2] In response to this Court's July 8 order: plaintiffs do not believe the district court's entry of judgment after the filing of the notices of appeal affects appellate jurisdiction, given that the district court's June 25 award of permanent injunctive relief "announce[d] a decision purporting to dispose of all of [plaintiffs'] claims." *FirsTier Mortg. Co. v. Invs. Mortg. Ins. Co.*, 498 U.S. 269, 277 (1991) (applying Federal Rule of Appellate Procedure 4(a)(2)). Plaintiffs also inform the Court of another pending suit challenging the EO: *League of Women Voters v. Trump*, No. 26-cv-11549 (D. Mass.).

## ARGUMENT

To obtain a stay, defendants and intervenors must make a "'strong showing'" that they are likely to succeed and that the equitable considerations favor a stay. *Nken v. Holder*, 556 U.S. 418, 426 (2009). They have not done so. The district court acted responsibly to preserve the status quo ahead of the midterms, thereby preventing the EO's unprecedented expansion of the federal government's role in elections from causing massive voter confusion and election interference.

## I.    DEFENDANTS AND INTERVENORS ARE UNLIKELY TO SUCCEED ON APPEAL

### A.    The Challenged Provisions of the Executive Order Are Ultra Vires and Unconstitutional

1. The President has no constitutional authority to regulate elections. Only the States and Congress have that power. *See* U.S. Const. art. I, § 4, cl. 1. Nowhere, however, has Congress authorized the President or USPS to take the steps directed by Section 3 of the EO, which requires USPS to impose design requirements for state ballot envelopes; compile voter-eligibility lists; monitor mail ballots for compliance with those lists; and refuse to deliver ballots of voters not on those lists. At no point in our history has USPS engaged in these (or any other) forms of election regulation. Indeed, the EO "risks turning USPS, a public service

8

institution, into a partisan instrument" for the first time.[3]  As a former high-ranking USPS official explained, the job of USPS is not to "'regulat[e] elections,'" and "'[i]f proper postage is paid on a mail piece, the USPS should deliver it.'"[4]

That transformation of USPS' role would depart markedly from our Nation's tradition of decentralizing the administration of elections.  *Supra* p. 4.  It would also pose extraordinary threats to our democracy.  Voters would likely be disenfranchised, as officials inevitably make mistakes in rushing to formulate new voter lists and roll out untested technologies to scan ballots for eligibility determinations.  *See* Dkt. 105 ¶¶ 45-47, 58-59, 64-65; Br. of State & Local Elections Officials & Elections Experts, Dkt. 175 at 17-24.  Rural and disabled voters—who have come to depend on mail voting—would be disproportionately harmed.  Dkt. 105 ¶¶ 55, 59; Dkt. 100-4 ¶¶ 28-30; Dkt. 100-6 ¶¶ 56-59.  And if federal officials get into the business of intercepting ballots, many voters would reasonably question if their ballots will be delivered.  There would also be a temptation on the part of the federal government to abuse this new authority for

---

[3] Angel & Katz, Brookings, *Trump's New Elections Executive Order & What It Would Mean for Voters* (May 14, 2026), https://www.brookings.edu/articles/safeguarding-fair-elections-amid-trumps-executive-orders/.

[4] Sneed et al., *Postal Service Won't Deliver Mail Ballots for States That Don't Hand Over Voter Lists*, CNN (June 10, 2026), https://www.cnn.com/2026/06/10/politics/postal-service-deliver-mail-in-ballots; *see* Dkt. 103-8 at 2 (USPS explaining that its "role [in the electoral process] is clear—we deliver the mail").

partisan ends.  Even the appearance of such abuse could have a devastating impact on voters' confidence in the integrity of elections.

Any congressional authorization for Section 3 would need to be exceedingly clear—and even then, would pose serious constitutional concerns.  Section 3's new ballot-verification program would effect "an enormous and transformative expansion" of an agency's authority, *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), on a question of vast "'political significance,'" *West Virginia v. EPA*, 597 U.S. 697, 721 (2022).  It has long been settled that USPS "cannot exclude or refuse to deliver" mail unless specifically authorized by "some law of Congress." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109 (1902); *see Hannegan v. Esquire, Inc.*, 327 U.S. 146, 155-156 (1946).  And giving USPS the power to intercept ballots would have a number of troubling constitutional implications.  *See, e.g.*, *Norman v. Reed*, 502 U.S. 279, 288-289 (1992) (discussing First and Fourteenth Amendment rights of "voters to express their own political preferences"); *USPS v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 126-127 (1981) (discussing First Amendment implications of restricting mail delivery).

The principal authority cited by the EO—39 U.S.C. § 401—includes nothing authorizing Section 3's ballot-interception and design requirements.  It merely empowers USPS "to adopt . . . rules and regulations . . . as may be necessary in the execution of its functions."  Elsewhere, Congress has exhaustively cataloged the

10

materials that USPS can refuse to deliver, making no mention of ballots. 39 U.S.C. § 3001. Congress has also barred USPS from engaging in any new nonpostal services—services other than "delivery of letters, printed matter, or mailable packages," *id.* § 102(5)—unless specifically authorized by statute, *id.* § 404(e). And under UOCAVA and the NVRA, Congress has carefully delineated the role that USPS plays in federal elections. *See, e.g.*, 52 U.S.C. § 20304(b)(2); *id.* § 20507(c)(1). Those comprehensive provisions show that when Congress wished to authorize USPS not to deliver mail or engage in nonpostal services, such as elections regulation—or when Congress otherwise wished to give USPS a role in elections—"'it knew how to do so and did so expressly.'" *FS Credit Opportunities v. Saba Cap. Master Fund*, 146 S. Ct. 1546, 1555 (2026).

Section 2 of the EO is also ultra vires. Nowhere has Congress authorized the federal government to compile and maintain "State Citizenship Lists" for determining voter eligibility. To the contrary, the NVRA and HAVA recognize that States have responsibility for maintaining voter rolls and verifying eligibility. *Supra* p. 4. Neither statute grants *any* authority to DHS, the agency that the EO charges with compiling its new voter eligibility lists. EO § 2(a). Although President Trump has urged Congress to adopt a measure with provisions akin to Section 2, *supra* pp. 4-5, his efforts have not been successful. He cannot use an

11

executive order to bypass "the people's elected representatives in Congress."

*NFIB v. Dep't of Lab.*, 595 U.S. 109, 121 (2022) (Gorsuch, J., concurring).[5]

2.  Without identifying any statutory authority for Sections 2 and 3, defendants and intervenors point to boilerplate statements in the EO requiring implementation "'consistent with applicable law.'"  U.S. Mot. 15; *see* Intervenors' Mot. 15.  But defendants cannot insulate an otherwise unconstitutional action from judicial review by inserting such a generic savings clause—"'nothing more than window dressing on an unconstitutional directive by the Executive.'"  *New York v. Trump*, 133 F.4th 51, 69 (1st Cir. 2025).  The Supreme Court struck down a recent executive order on birthright citizenship, *see Trump v. Barbara*, 609 U.S. __, 2026 WL 1870543, at *15 (2026), even though it contained a similar savings clause, *see* 90 Fed. Reg. 8449, § 5(b) (Jan. 29, 2025).  "Savings clauses are read in their context, and they cannot be given effect" where—as here—"the Court, by rescuing

---

[5] Defendants and intervenors assert that "use of the State Citizenship List [under Section 2(a)] is *optional*."  Intervenors' Mot. 12; *see* U.S. Mot. 10-11.  But Section 2(b) pointedly threatens criminal prosecution of state and local officials, *see* Dkt. 191 at 29-30, and the White House has said that the EO "order[s] citizenship verification," Dkt. 103-2.  Defendants have had several opportunities in this litigation to clarify that they will not prosecute officials for failure to use the lists—but they have repeatedly declined to do so.  *E.g.*, Dkt. 181 at 40-45 (hearing transcript); Dkt. 157 at 36 (noting the lists could be used "to facilitate . . . post-election law-enforcement activity").  The carefully worded language in defendants' stay motion (at 17) does nothing to ease plaintiffs' reasonable fears of prosecution.

the constitutionality of a measure, would override clear and specific language."
*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018).[6]

Although defendants and intervenors assert that there theoretically "could be lawful" ways to implement Sections 2 and 3, *e.g.*, U.S. Mot. 14, they never say what those ways would be—short of abandoning the EO's programs entirely. Intervenors assert that USPS' proposed rule would afford States "'control over who would (or would not) be able to vote by mail.'" Intervenors' Mot. 17. But that does not cure Section 3's constitutional infirmities—or the threats of error, abuse, and disenfranchisement discussed above. *Supra* pp. 8-11. It is plainly inconsistent with our Constitution's allocation of power for the President to give USPS new ballot-interception and design responsibilities and coerce States into using federal citizenship lists to determine voter eligibility—all without the involvement of Congress.

Intervenors are also wrong (Mot. 17-19) that the Take Care Clause gives the President carte blanche to order executive officials to engage in unconstitutional rulemakings. The duty to "take Care that the Laws be faithfully executed" allows the President to administer laws duly enacted by Congress, *see Youngstown Sheet*

---

[6] Far from holding that a generic savings clause insulates executive orders from judicial review, the court in *Building & Construction Trades Department v. Allbaugh*, 295 F.3d 28, 34-36 (D.C. Cir. 2002), extensively examined the legality of the challenged EO on preemption grounds. *See City & Cnty. of San Francisco*, 897 F.3d at 1239-1240 (discussing *Allbaugh*).

*& Tube Co. v. Sawyer*, 343 U.S. 579, 587-588 (1952), not to usurp powers exclusively entrusted to States and Congress, *supra* pp. 3-4. In any event, the district court's injunction does not "enjoin[] the President from instructing a federal agency to engage in rulemaking." Intervenors' Mot. 17. The injunction does not apply to the President. Dkt. 191 at 34-36. And it allows "any steps to implement the EO," including rulemaking, so long as those steps do not take effect for this fall's elections. Dkt. 208 at 5.

## B.   Plaintiffs' Claims Are Justiciable

Plaintiffs have standing, and their challenge is ripe. Requiring plaintiffs to wait months to challenge actions directed by the EO would cause them to suffer immediate harms and, as a practical matter, threaten to insulate the EO's unlawful directives from judicial review before the November elections. The Supreme Court recently cautioned against applying justiciability doctrines in ways that "could channel . . . election disputes to shortly before election day." *Bost*, 607 U.S. at 80. The district court properly heeded that instruction.

1. For purposes of standing, the challenged provisions of the EO injure plaintiffs in multiple significant ways. Most fundamentally, the EO burdens plaintiffs' sovereign interests by interfering with their ability to carry out state laws regarding mail voting and voter eligibility. *See, e.g.*, Dkt. 105 ¶¶ 40-46. Indeed, the EO effectively requires States to seek USPS' approval if they "intend[] to

14

allow for mail-in or absentee ballots."  EO § 3(b)(ii); *cf. Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 544 (2013) (recognizing harm to state sovereignty where States must "beseech the Federal Government for permission to implement laws that they would otherwise have the right to enact and execute on their own").

The challenged provisions also require plaintiffs to expend time and resources *now* to prevent—to the extent possible—chaos, confusion, and disenfranchisement when defendants rush to finalize untested election protocols on the eve of the upcoming midterms.  For example, to ensure that all eligible voters have the ability to register and cast a ballot, plaintiffs would have to analyze and update the EO's inevitably flawed voter lists, train elections officials, educate voters, and change their ballot mail—all of which require (and in fact, have already required) plaintiffs to divert resources from other important election administration work.  *See, e.g.*, Dkt. 105 ¶¶ 15-30, 44-57, 60-63.[7]

Defendants and intervenors argue that plaintiffs' injuries cannot support standing because, in their view, "there remain 'many uncertainties' about how the agencies will implement the [EO]."  U.S. Mot. 10; *see* Intervenors' Mot. 15-16.  But the EO sets forth "multiple specific directives" requiring agencies to take certain actions "at specified times," and further requires that "definite substantive

---

[7] Many States have already purchased mail ballot envelopes that depart from the requirements that the EO directs USPS to adopt.  Dkt. 191 at 15; Dkt. 105 ¶ 62.

15

outcomes be implemented" in the immediate term.  Dkt. 190 at 16 (citations omitted); *see* Dkt. 191 at 3-4.  Defendants have already taken steps to carry out the challenged provisions pursuant to those timelines and directives.  *Supra* pp. 6-7.  They provide no reason to think that—absent the district court's injunction—they would not implement those directives on the specified timelines.  *See Doe v. Trump*, 157 F.4th 36, 51-52 (1st Cir. 2025) (state plaintiffs had standing to challenge executive order based on likely injuries from future implementation).

2.  Plaintiffs' claims are ripe for similar reasons.  Ripeness and standing originate from the same Article III case-or-controversy requirement and often "'boil down to the same question.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014).  Defendants and intervenors rely on *Trump v. New York*, 592 U.S. 125 (2020), which treated as unripe a challenge to a presidential memorandum announcing a policy of excluding noncitizens from the census apportionment base.  But that case, which involved "speculation that impede[d] judicial review," *id.* at 131, illustrates why plaintiffs' challenge here is ripe.

In *Trump*, the challenged memorandum was an abstract "general statement of policy," 592 U.S. at 131, and the federal government conceded that it could not "feasibly implement the memorandum" as written, *id.* at 133.  The EO here is far more prescriptive, as it "directs that specific agency action be taken in a constricted timeframe."  Dkt. 208 at 4; *see* Dkt. 190 at 16.  And defendants have never

16

disclaimed that they will, in fact, carry out the challenged provisions as the President directed. To the contrary, they have detailed the steps that they plan to take to finalize the USPS ballot-verification program "[b]y the time that the first mail-in ballot is ready to mail." Dkt. 194-2 ¶ 7; *see supra* p. 6.

Given defendants' explicit commitment to finalizing that program, it is immaterial that the EO directed USPS "to initiate a *proposed* rulemaking." U.S. Mot. 1, 14. The EO also ordered that USPS issue "[a]ny final rule" within 120 days, EO § 3(d), and defendants' submissions leave no room for doubt that they intend to implement a final rule "[c]onsistent with the Proposed Rule," Dkt. 194-2 ¶ 7. In these circumstances, the fact that defendants have "not yet promulgated final rules . . . implementing the challenged provisions" does "not mean that [their] eventual promulgation [is] an uncertain or contingent event." *Jensen v. R.I. Cannabis Control Comm'n*, 160 F.4th 18, 24-25 (1st Cir. 2025).[8]

This case also differs from *Trump* because the challengers there would have "suffer[ed] no concrete harm from the challenged policy" unless and until executive officials took future actions not specified in the memorandum. 592 U.S. at 134. Here, by contrast, the district court found that "Plaintiff States [are]

---

[8] Defendants also compare (Mot. 2, 13) this case to *Trump v. American Federation of Government Employees*, 145 S. Ct. 2635 (2025). But there, the Court stayed an injunction on the ground that the federal government was "likely to succeed on its argument that the [challenged] Executive Order [was] lawful." *Id*. Here, defendants have not even defended the challenged EO on the merits.

17

experiencing injury now" from the EO because of the ongoing work required to administer the upcoming midterms.  Dkt. 191 at 16.  Given the "extraordinarily complicated and difficult" features of administering elections, which "require enormous advance preparations by state and local officials," *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring), plaintiffs are already preparing for the November elections.  Dkt. 105 ¶ 8; *see* Dkt. 190 at 12-13.  The record contains many detailed examples of ways in which the EO would—if not enjoined—require States to take immediate, costly measures that would divert time and resources away from other important pre-election tasks.  *See, e.g.*, Dkt. 105 ¶¶ 29, 56; Dkt. 100-4 ¶ 34; Dkt. 100-7 ¶ 12; Dkt. 100-8 ¶ 15; Dkt. 100-12 ¶ 12.

For example, in preparation for Section 3's new mail-voting program, States would need to compile accurate lists of voters registered for mail ballots to transmit to USPS.  Dkt. 105 ¶ 44.  On its own, that task would be difficult, requiring States to "compil[e] data, convert[] or prepar[e] data into an acceptable format for USPS, remov[e] information prohibited from disclosure under state law (e.g., driver's license numbers and social security numbers), and transmit[] voluminous sensitive data in a secure manner."  *Id.* ¶ 47.  Because States must submit those lists to USPS before the deadline in many jurisdictions for registering to vote or requesting mail ballots, States would be required to "supplement and provide suggested modifications or amendments."  *Id.* ¶ 49; *see id.* ¶¶ 45-46.  And

18

when USPS later "provide[s] each State with a list of individuals . . . who are enrolled with the USPS," EO § 3(b)(iv), States would have to undertake the "technically challenging task" of comparing USPS' list to their own list of eligible voters, Dkt. 105 ¶ 50.  That would require "reconcil[ing] data sources based on . . . differences in data formatting and the likely absence of common unique record identifiers."  *Id.*; *see id.* ¶ 52 (discussing "high risk of errors" in this process).

Each of these tasks—along with the many necessary responses to Section 2 of the EO—would require States to train elections officials at the state and local levels.  *See, e.g.*, Dkt. 105 ¶¶ 27, 54.  Statewide training is no small endeavor.  As one California official explained, "[w]hen we need to train county elections officials in all 58 counties, the state is split into five regions and the trainings require coordination with all the county elections officials in each region," as well as "written advisories, and constant follow-up and iterations in these materials based on feedback."  Dkt. 100-1 ¶ 22.  Public education is also critical when there are last-minute changes to election laws.  Absent injunctive relief here, for example, States would need to warn voters about the new USPS verification program and "how [it] may impact a citizen's ability to vote by mail," particularly in States where voters are accustomed to "automatically receiving mail ballots and being able to vote by mail."  Dkt. 100-3 ¶ 54; *see* Dkt. 105 ¶ 55.

Invoking *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), defendants and intervenors argue that plaintiffs "cannot manufacture a cognizable injury *now* by incurring costs to guard against potential *future* injury."  U.S. Mot. 16; *see* Intervenors' Mot. 7-8.  But *Clapper* involved an attempt by plaintiffs to "repackage[]" a "failed theory of standing," 568 U.S. at 416—a theory predicated on "highly speculative fear[s]," *id.* at 410—by voluntarily incurring expenses in response to those fears.  Here, there is nothing speculative about the EO's directives or the harms they are already inflicting on plaintiffs.  Given the "considerable advance planning" required to administer the rapidly approaching midterms, plaintiffs would—absent the injunction—have to act "now" to ensure compliance.  *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201-202 (1983).[9]

Defendants and intervenors are wrong in suggesting that plaintiffs could simply choose to disregard the EO's directives.  *See* U.S. Mot. 10; Intervenors' Mot. 12-13.  The grave consequences of doing nothing—disenfranchisement of

---

[9] In response to this Court's July 8 order:  *DSCC v. Trump*, 2026 WL 1487833 (D.D.C. May 28, 2026), *appeal docketed*, No. 26-5193 (D.C. Cir.), does not bear on the movants' likelihood of success here.  The district court in that case concluded that *private* plaintiffs' challenges to the EO should wait for final implementation.  *Id.* at *1.  Until then, the court reasoned, the plaintiffs had "not suffered any harm."  *Id.* at *13.  By contrast, plaintiff States would suffer immediate harm in the absence of injunctive relief, given the tremendous work required by state and local officials to prepare for the EO's rollout.

20

state voters, voter confusion, and threatened criminal prosecution of elections officials, *see* Dkt. 105 ¶¶ 22, 36-37, 49—have left plaintiffs no practical choice but to begin preparing for the disruptive new actions ordered by the EO or to bring this suit.  Whether or not the EO is "self-executing" (U.S. Mot. 18) is irrelevant.  *Cf. First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1127 (2026) (treating challenge to subpoena as justiciable even though it was "'non-self-executing'").  Plaintiffs' challenge is ripe because the EO requires them either to "tak[e] immediate action" or "risk[] substantial future penalties for non-compliance."  *Chamber of Com. of U.S. v. Reich*, 57 F.3d 1099, 1101 (D.C. Cir. 1995); *see League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("Damocles's sword does not have to actually fall . . . before the court will issue an injunction.").

3.  While the district court concluded that plaintiffs' claims were ripe as to elections on or before November 3, 2026, Dkt. 190 at 11-16, it held that they were unripe as to later elections and partially dismissed plaintiffs' claims, *id.* at 10-11.  Defendants contend "[t]he same uncertainties that render plaintiffs' suit premature as to future elections apply equally to the November 2026 election."  U.S. Mot. 2.  But the partial dismissal *benefits* defendants by limiting the injunction's scope.  And the district court dismissed the claims as to future elections on *prudential* grounds.  Dkt. 190 at 11, 17; Dkt. 208 at 4.  The court based that partial dismissal

21

on differing levels of hardship, which is a "solely prudential" consideration. *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 52 n.8 (1st Cir. 2021).

Prudential ripeness turns, in significant part, on whether "withholding judgment will impose hardship." *Stern v. U.S. Dist. Ct. for Dist. of Mass.*, 214 F.3d 4, 10 (1st Cir. 2000). Here, in light of the EO's specific timelines and the rapidly approaching midterms, the district court recognized that "postponing judicial review is impracticable and may inflict significant hardship on Plaintiffs." Dkt. 190 at 12. "[T]he practical realities of running an election," the court stressed, "require Plaintiffs to take actions for the upcoming election now." *Id.* at 13; *see* Dkt. 208 at 4 ("claims as to the upcoming elections are ripe" because States are "actively planning" and "currently administering such elections").

The district court also expressed concern that, if plaintiffs were forced to wait, defendants might altogether avoid judicial review before the midterms, given the "ever-narrowing window of time in which review is appropriate and practicable." Dkt. 190 at 14. Defendants assert that their justiciability arguments "do[] not foreclose the *possibility* of future judicial review." U.S. Mot. 18 (emphasis added). But they never concede that relief would actually be available to prevent harm ahead of the fall elections. If defendants succeed in avoiding review now on ripeness grounds, nothing would stop them from turning around and trying to

22

invoke the "*Purcell* principle" to avoid meaningful review as the election approaches. *See Purcell v. Gonzalez*, 549 U.S. 1 (2006).

By contrast, the district court reasoned that withholding review "of the EO *as it relates to distant elections* will pose little hardship where there will be sufficient time for legal challenges" to later implementing actions. Dkt. 190 at 11 (emphasis in original). Plaintiffs believe their claims are ripe for purposes of Article III as to all future elections, and that any such implementing actions will inevitably prove unlawful. But they agree that the hardship posed by waiting to challenge the EO is exponentially greater as to "imminently impending elections." *Id*. at 16.

## II.    THE EQUITABLE CONSIDERATIONS WEIGH HEAVILY AGAINST A STAY

Defendants and intervenors have not shown irreparable harm or that the public interest would support a stay. No irreparable harm is suffered "from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). And the injunction "does not prevent any steps to implement the EO . . . for elections that will occur after November 3, 2026." Dkt. 208 at 5. Defendants can also implement the EO for this year's elections in non-plaintiff States. *E.g.*, Dkt. 194-1 ¶ 8 (describing how defendants can comply with the district court's order and implement Section 2 with respect to non-plaintiffs).

As to Section 3, defendants assert that "[o]perationally, it would not be possible for [USPS] to put a two-tiered system in place" for purposes of this fall's

elections—that is, "one set of rules [for] the ballot mail of the [p]laintiff States, and another [for] the remaining States." Dkt. 194-2 ¶ 5; *see* U.S. Mot. 19. Even if that were true, defendants and intervenors have not shown irreparable harm. There is no reason to think that Section 3's immediate rollout is necessary to "ensur[e] that mail ballots cast . . . are securely delivered and counted" during this year's elections. Intervenors' Mot. 1, 20. Any such assertion is "dubious as a matter of fact and reality" given that no similar USPS rule has ever existed, and "[i]t is not as if no [other] protections remain." *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 15 (1st Cir. 2020). States have protocols in place to verify voter eligibility and protect against mail-ballot fraud.[10] And studies have repeatedly demonstrated that noncitizen voting and fraud related to mail voting are extraordinarily rare. *See* Br. of State & Local Elections Officials & Elections Experts, Dkt. 175 at 16-17 (citing, *e.g.*, M.I.T. Election Data & Sci. Lab, *Voting by Mail and Absentee Voting* (updated Feb. 28, 2024), https://perma.cc/XAE9-6VLV).[11] Neither defendants nor intervenors identify any evidence to the contrary.

---

[10] *See, e.g.*, Nat'l Conf. State Legislatures, *How States Verify Voted Absentee/Mail Ballots* (updated May 20, 2026), https://www.ncsl.org/elections-and-campaigns/table-14-how-states-verify-voted-absentee-mail-ballots.

[11] *See also, e.g.*, Angel et al., *Mail Voting in the US: Data Points to Very Low Fraud and Significant Benefits to Voters*, Brookings (Nov. 6, 2025), https://brookings.edu/articles/mail-voting-in-the-us-data-points-to-very-low-fraud-and-significant-benefits-to-voters/; Ctr. for Election Innovation & Research,

(continued…)

Staying the district court's injunction, by contrast, would harm both plaintiffs and the public interest.  State and local officials are actively preparing for the rapidly approaching midterms, and many plaintiff States are administering primary elections in the interim.  Dkt. 105 ¶ 8.  Staying the injunction would force plaintiffs to divert resources away from the pressing tasks required to carry out these elections.  *Id.* ¶¶ 27, 29, 56.  And plaintiffs would be forced to resume burdensome efforts to comply with the EO, such as developing procedures and IT systems to ensure the accuracy of federal voter lists, redesigning ballot mail, and performing the many other tasks detailed above.  *Supra* pp. 18-19.[12]

Even with "heroic efforts" by state and local officials in the coming weeks, *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring), the EO's rollout would be "disastrous from a practical perspective," Br. of State & Local Elections Officials & Elections Experts, Dkt. 175 at 2.  "[W]ith so little time remaining before the rapidly approaching [midterms]," *id.* at 12, the EO would "create chaos and

---

*Update: Review of Claims of Noncitizens Registrants and Voters* (Feb. 2026), https://perma.cc/BLE2-HBHN.

[12] In response to this Court's July 8 order:  plaintiffs' harms are no less substantial merely because another court has entered a preliminary injunction against USPS' implementation of its proposed rule. *NAACP v. USPS*, 2026 WL 1893762 (D.D.C. July 1, 2026), *appeal docketed*, No. 26-5257 (D.C. Cir.).  "The existence of a preliminary injunction issued by another court that provides relief to the plaintiffs does not negate their irreparable harm," as that injunction "could be modified, limited, or overturned at any time." *CASA, Inc. v. Trump*, 793 F. Supp. 3d 687, 698 (D. Md. 2025).

confusion for election officials and voters alike," *id.* at 3.  An atmosphere of confusion "create[s] a disincentive for citizens who would otherwise attempt" to vote.  *Newby*, 838 F.3d at 13 (citing *Purcell*, 549 U.S. at 4-5).  And courts routinely deny stays where, as here, they would "upend" "the status quo."  *E.g.*, *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778 (9th Cir. 2018).

The EO's untested new verification programs also threaten to disenfranchise voters—in particular, rural and disabled voters who rely heavily on mail voting.  *See, e.g.*, Dkt. 105 ¶¶ 31-32, 58-59.  For example, USPS' new voter lists, which USPS will use to withhold ballots, will inevitably contain omissions due to the inherently dynamic nature of voter rolls.  *Id.* ¶¶ 47-53.[13]  And no one knows if USPS' new online "portal" for enrolling voters eligible to vote by mail, Dkt. 194-2 ¶ 7, or its ballot-scanning technology will actually function as intended.  Nor is it clear that USPS—an agency facing significant funding pressures and related operational challenges, *see* U.S. Gov't Accountability Off., GAO-26-109008, *USPS: Urgent Action Needed to Fix Unsustainable Business Model and Improve Service Performance* (2026), https://www.gao.gov/assets/gao-26-109008.pdf—can competently administer a ballot-verification program that is unlike anything it has

---

[13] Section 2's citizenship lists will also inevitably contain omissions due to flawed federal citizenship data, Dkt. 105 ¶¶ 16-17, changes in voter residency and the lack of reliable federal address data, *id.* ¶¶ 19-20, and the addition of naturalized citizens to voter rolls in the 60 days before an election, *id.* ¶ 21.

ever undertaken.  Its recent performance in other areas is not encouraging.  *See id.*
And defendants' submissions before the district court detail how complicated the
rollout will be.  *See, e.g.*, Dkt. 194-2 ¶¶ 7-8.  Because the public interest favors
"permitting as many qualified voters to vote as possible," *Obama for Am. v.
Husted*, 697 F.3d 423, 437 (6th Cir. 2012), these threats of chaos, confusion, and
disenfranchisement weigh heavily against a stay.

# CONCLUSION

The motion for a stay pending appeal should be denied.

Dated:  July 13, 2026

Respectfully Submitted,

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*

M. PATRICK MOORE, JR.
  *First Assistant Attorney General*
DAVID C. KRAVITZ
  *State Solicitor*
VANESSA A. ARSLANIAN
  *State Trial Counsel*
JARED B. COHEN
JAK KUNDL
  *Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2107
Vanessa.Arslanian@mass.gov

*Counsel for the Commonwealth of Massachusetts*

ROB BONTA
  *Attorney General of California*

By:  */s/ Ian Fein*
SAMUEL T. HARBOURT
  *Solicitor General*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
AARON D. PENNEKAMP
  *Supervising Deputy Solicitor General*
L. NICOLE ALLAN
IAN FEIN
  *Deputy Solicitors General*
SETH E. GOLDSTEIN
  *Supervising Deputy Attorney General*
ANNE P. BELLOWS
KEVIN L. QUADE
LISA C. EHRLICH
MALCOLM A. BRUDIGAM
MICHAEL S. COHEN
ROBERT WILLIAM SETRAKIAN
  *Deputy Attorneys General*
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 510-3466
Ian.Fein@doj.ca.gov

*Counsel for the State of California*

AARON D. FORD
  *Attorney General of Nevada*
HEIDI PARRY STERN
  *Solicitor General*
K. BRUNETTI IRELAND
  *Chief of Special Litigation*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-9246
hstern@ag.nv.gov

*Counsel for the State of Nevada*


KRISTIN K. MAYES
  *Attorney General of Arizona*
KARA KARLSON
KAREN J. HARTMAN-TELLEZ
JOSHUA M. WHITAKER
SYREETA TYRELL
  *Assistant Attorneys General*
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-8118
Kara.Karlson@azag.gov

*Counsel for the State of Arizona*


WILLIAM TONG
  *Attorney General of Connecticut*
MAURA MURPHY
  *Deputy Associate Attorney General*
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
(860) 808-5020
Maura.Murphy@ct.gov

*Counsel for the State of Connecticut*

NICHOLAS W. BROWN
  *Attorney General of Washington*
TERA M. HEINTZ
CRISTINA SEPE
KARL D. SMITH
  *Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
Tera.Heintz@atg.wa.gov

*Counsel for the State of Washington*


PHILIP J. WEISER
  *Attorney General of Colorado*
SHANNON STEVENSON
  *Solicitor General*
PETER BAUMANN
  *Senior Assistant Attorney General*
1300 Broadway
Denver, CO 80203
(720) 508-6400
Shannon.Stevenson@coag.gov

*Counsel for the State of Colorado*


KATHLEEN JENNINGS
  *Attorney General of Delaware*
IAN R. LISTON
  *Director of Impact Litigation*
VANESSA L. KASSAB
  *Deputy Attorneys General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Ian.Liston@delaware.gov

*Counsel for the State of Delaware*

29

BRIAN L. SCHWALB
  *Attorney General of the District of Columbia*
CAROLINE S. VAN ZILE
  *Solicitor General*
400 6th Street, NW
Washington, DC 20001
(202) 724-6609
caroline.vanzile@dc.gov

*Counsel for the District of Columbia*

AARON M. FREY
  *Attorney General of Maine*
KATHERINE W. THOMPSON
  *Special Counsel*
6 State House Station
Augusta, ME 04333
(207) 626-8800
Kate.Thompson@maine.gov

*Counsel for the State of Maine*

DANA NESSEL
  *Attorney General of Michigan*
NEIL GIOVANATTI
ERIK GRILL
  *Assistant Attorneys General*
P.O. Box 30736
Lansing, MI 48909
(517) 335-7659
grille@michigan.gov

*Counsel for the State of Michigan*

KWAME RAOUL
  *Attorney General of Illinois*
JANE ELINOR NOTZ
  *Solicitor General*
ALEX HEMMER
  *Deputy Solicitor General*
115 S. LaSalle Street
Chicago, IL 60603
(312) 814-5526
Alex.Hemmer@ilag.gov

*Counsel for the State of Illinois*

ANTHONY G. BROWN
  *Attorney General of Maryland*
VIRGINIA A. WILLIAMSON
  *Assistant Attorney General*
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6584
vwilliamson@oag.state.md.us

*Counsel for the State of Maryland*

KEITH ELLISON
  *Attorney General of Minnesota*
ANGELA BEHRENS
ALLEN COOK BARR
  *Assistant Attorneys General*
LINDSEY E. MIDDLECAMP
  *Special Counsel*
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 300-0711
Angela.Behrens@ag.state.mn.us

*Counsel for the State of Minnesota*

JENNIFER DAVENPORT
  *Attorney General of New Jersey*
MEGHAN K. MUSSO
JONATHAN MANGEL
JOSHUA P. BOHN
  *Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276
Meghan.Musso@law.njoag.gov

*Counsel for the State of New Jersey*


LETITIA JAMES
  *Attorney General of New York*
BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
RABIA MUQADDAM
  *Chief Counsel, Federal Initiatives*
28 Liberty Street
New York, NY 10005
(212) 416-6046
Judith.Vale@ag.ny.gov

*Counsel for the State of New York*


DAN RAYFIELD
  *Attorney General of Oregon*
ROBERT A. KOCH
  *Senior Assistant Attorney General*
1162 Court Street NE
Salem, OR 97301
(503) 378-4402
Robert.A.Koch@doj.oregon.gov

*Counsel for the State of Oregon*


RAÚL TORREZ
  *Attorney General of New Mexico*
BAILEY COLFAX
  *Assistant Attorney General*
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060
bcolfax@nmdoj.gov

*Counsel for the State of New Mexico*


JEFF JACKSON
  *Attorney General of North Carolina*
LAURA HOWARD
  *Chief Deputy Attorney General*
DANIEL P. MOSTELLER
  *Associate Deputy Attorney General*
114 W. Edenton Street
Raleigh, NC 27603
(919) 716-6026
dmosteller@ncdoj.gov

*Counsel for the State of North Carolina*


PETER F. NERONHA
  *Attorney General of Rhode Island*
JAMES J. ARGUIN
  *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
jarguin@riag.ri.gov

*Counsel for the State of Rhode Island*

31

CHARITY R. CLARK
  *Attorney General of Vermont*
RYAN P. KANE
  *Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.Kane@vermont.gov

*Counsel for the State of Vermont*


JOSHUA L. KAUL
  *Attorney General of Wisconsin*
LYNN LODAHL
  *Assistant Attorney General*
17 West Main Street
Madison, WI 53707
(608) 264-6219
Lynn.Lodahl@wisdoj.gov

*Counsel for the State of Wisconsin*


JAY JONES
  *Attorney General of Virginia*
TILLMAN J. BRECKENRIDGE
  *Solicitor General*
202 North Ninth Street
Richmond, VA 23219
(804) 786-7704
tbreckenridge@oag.state.va.us

*Counsel for the Commonwealth of Virginia*


JOSH SHAPIRO
  *Governor of the Commonwealth of Pennsylvania*
MICHAEL J. FISCHER
  *Executive Deputy General Counsel*
JACOB B. BOYER
  *Deputy General Counsel*
30 North Third Street, Suite 200
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov

*Counsel for the Governor of the Commonwealth of Pennsylvania*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I certify that:

1.     This document complies with the type-volume limitations of this Court's order of July 8, 2026.  The default length limit for a response to a motion under Fed. R. App. P. 27(d)(2)(A)-(B) is 5,200 words or 20 pages.  The Court permitted plaintiffs to file a combined opposition that exceeded the default page limit by 5 pages, or 25 percent.  Plaintiffs understand the Court's order to allow a commensurate 25-percent exceedance of the default 5,200-word limit, to a revised limit of 6,500 words.  This document complies with that limit because, excluding parts of the document exempted by Fed. R. App. P. 32(f), the brief contains 6,486 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(b) because the brief has been prepared in proportionally spaced typeface using Microsoft Word in Times New Roman that is at least 14 points.


                                        /s/ Ian Fein
                                        Ian Fein
                                        Deputy Solicitor General

**CERTIFICATE OF SERVICE**

On July 13, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Ian Fein
Ian Fein
Deputy Solicitor General